IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| IN RE: | AARON KYLE LAVIGNE and<br>AMANDA MARIE LAVIGNE,<br>Debtors. | Case No. 07-30192<br>Chapter 13 |
| IN RE: | ROMEL LEON HUNT and<br>KIMBERLY ANTOINETTE HUNT,<br>Debtors. | Case No. 07-31402<br>Chapter 13 |
| IN RE: | KENNETH LEON OLIVER,<br>Debtor. | Case No. 07-31247<br>Chapter 13 |
| IN RE: | ANDREA LYNN CARPENTER,<br>Debtor. | Case No. 06-32914<br>Chapter 13 |

## **MEMORANDUM OPINION**

The issue presented in these Chapter 13 cases is whether the Court can confirm a debtor's

plan that proposes bifurcating a secured creditor's claim into secured and unsecured portions if

the collateral is a vehicle that secures its own purchase price and the negative equity of a trade-in

vehicle.[1]  The Court holds that a creditor does not have a purchase money security interest in

connection with financing it provides for the acquisition of a vehicle to the extent that the

financing secures the negative equity the creditor paid off on the debtor's trade-in vehicle.

Applying the dual status rule, the Court concludes that a debtor may bifurcate such a claim only

to the extent that it secures the non-purchase money portion of the financing.

## FACTUAL BACKGROUND

The debtors in each of these four cases purchased motor vehicles within the 910-day

period immediately preceding the filing of their bankruptcy petitions.  Each of the debtors has

---

[1] Negative equity is the amount by which the outstanding loan balance exceeds the value of the trade-in vehicle.

submitted a Chapter 13 plan that proposes bifurcating the claims of the creditors that financed the purchases of those motor vehicles by paying the value of the respective motor vehicles as allowed secured claims and by paying the remaining balances as allowed unsecured claims. The four creditors object to the confirmation of these plans in each instance on the grounds that the plans fail to satisfy the conditions imposed by the unnumbered paragraph at the end of § 1325(a), inserted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The creditors argue that this new provision added by BAPCPA prohibits the Court from confirming a plan that does not provide for the payment in full of a claim held by a creditor that has a purchase money security interest in a motor vehicle purchased by a debtor for personal use within the 910-day period preceding a bankruptcy filing.

At issue in all four of these cases is whether the applicable creditor has a purchase money security interest in the debtor's motor vehicle.[2] The debtors contend the creditors do not have such an interest because the vehicles in each instance secure more than their own purchase price. In each of these cases, the original amounts financed also included the negative equity in the debtors' trade-in vehicles. The Court conducted hearings on May 9, 2007, June 20, 2007, and August 15, 2007, after which the Court took these cases under advisement. Because the issue presented in each case is identical, the Court issues this combined opinion. The facts in these cases, while different, follow the same general pattern and are discussed briefly below.

### LaVigne (Case No. 07-30192)

Debtor Aaron LaVigne ("LaVigne") bought a 2006 Chevrolet HHR from Whitlow Chevrolet on July 4, 2006. LaVigne traded in his 2005 Chevrolet Silverado as part of the sale transaction. LaVigne owed $27,603.92 on his 2005 Chevrolet Silverado, and Whitlow Chevrolet

---

[2] There is no dispute that the Debtors purchased the vehicles in question within the 910-day period preceding the petition date in each case, or that the Debtors purchased each vehicle for personal use.

valued the trade-in vehicle at $20,900. Whitlow Chevrolet financed the resulting deficit as part

of the same loan agreement that included the purchase price for the 2006 Chevrolet HHR. The

"cash price" of the Chevrolet HHR was $18,370.68. Accordingly, Whitlow Chevrolet financed a

total of $27,232.02. Whitlow Chevrolet assigned the loan to GMAC.

Less than 910 days after the sales transaction, LaVigne and his wife, Amanda LaVigne,

(the "LaVignes") filed a petition under Chapter 13 of the Bankruptcy Code. GMAC filed a proof

of claim for $25,330.44. The LaVignes, through their attorney, submitted a Chapter 13 plan that

proposed bifurcating GMAC's claim into a secured portion of $19,473.80, that being an amount

greater than the alleged value of the vehicle, and an unsecured portion of $6,473.80, that being

for the remaining balance. GMAC timely filed an objection to the LaVignes' Chapter 13 plan

because of this proposed bifurcation of its debt. The parties do not dispute that the certificate of

title for the Chevrolet HHR lists GMAC as the first lienholder. LaVigne maintains that he is

entitled to bifurcate the secured claim because it includes not only the purchase price of the

Chevrolet HHR but also the financing for the repayment of the negative equity from his trade-in.

### Hunt (Case No. 07-31402)

Debtors Romel and Kimberly Hunt (the "Hunts") jointly filed a petition under Chapter 13

of the Bankruptcy Code on April 13, 2007 (the "Hunt Petition Date"). Less than 910 days prior

to the Hunt Petition Date, the Hunts purchased a 2005 Chevrolet Trailblazer for their personal

use. Heritage Chevrolet financed the purchase of this motor vehicle. The "cash price" of the

2005 Chevrolet Trailblazer, as listed in the contract, was $31,506.77. The Hunts traded in their

2002 Chevrolet Trailblazer as part of the sales transaction. The Hunts received $12,500 for their

trade-in vehicle on which they owed $19,885.58. Heritage Chevrolet financed the deficit,

$7,385.58, in the same loan as the purchase price of the 2005 Chevrolet Trailblazer. Heritage

Chevrolet thus financed a total of $35,127.44.   Prior to the Hunt Petition Date, Heritage Chevrolet assigned the loan to Branch Banking and Trust Company ("BB&T").

BB&T timely filed a proof of claim for the unpaid balance of its loan in the amount of $27,049 as of the Hunt Petition Date.  The Hunts, through their attorney, submitted a Chapter 13 plan that proposed bifurcating BB&T's claim into a secured portion of $16,600, that being the replacement value of the 2005 Chevrolet Trailblazer, and an unsecured portion, that being for the remaining balance.

On May 8, 2007, BB&T objected to the confirmation of the Hunts' Chapter 13 plan because of the bifurcation of its debt into secured and unsecured portions.  The parties do not dispute that the certificate of title for the Chevrolet Trailblazer lists BB&T as the first lienholder. The Hunts maintain that they are entitled to bifurcate the secured claim because it includes not only the purchase price of the Chevrolet Trailblazer but also the financing for the repayment of the negative equity from their trade-in vehicle.

### Oliver (07-31247)

Debtor Kenneth Oliver ("Oliver") bought a 2001 Mercedes Benz from CarMax on December 22, 2006.  Oliver traded in a 2005 Nissan Pathfinder as part of the sales transaction. He owed $24,332.35 on the Pathfinder that was valued at only $17,000.  CarMax financed the resulting deficit as part of the same loan agreement that included the purchase price for the Mercedes.  The financing agreement listed the "cash price" of the Mercedes as $22,998.  CarMax thus financed a total of $32,998.08.  CarMax assigned the loan to Citifinancial Auto.

Less than 910 days later, Oliver filed a petition under Chapter 13 of the Bankruptcy Code.  Citifinancial timely filed a proof of claim for $32,714.57.  Through his attorney, Oliver submitted a Chapter 13 plan proposing bifurcation of Citifinancial's claim.  The plan proposed

paying Citifinancial $25,150 for its secured claim, that being the estimated replacement value of the vehicle.  The plan provided that Citifinancial would have an unsecured claim as to the remaining outstanding balance of the loan.

Citifinancial filed an objection to the confirmation of Oliver's Chapter 13 plan because of the proposed bifurcation of its debt into secured and unsecured portions.  The parties do not dispute that the certificate of title for the Mercedes lists Citifinancial as the first lienholder. Oliver maintains that he is entitled to bifurcate the secured claim because it includes not only the purchase price of the Mercedes but also the financing for the repayment of the negative equity from his trade-in vehicle.

### Carpenter (06-32914)

Debtor Andrea Lynn Carpenter ("Carpenter") purchased a 2006 Nissan Sentra for her personal use on July 17, 2006.  The seller financed the purchase of the vehicle.  As part of the sales transaction, Carpenter traded in a 1999 Suzuki Grand Vitara.  The seller valued the Suzuki at $2,800.  Carpenter still owed $7,581.91 on the Suzuki.  The seller financed the resulting deficit as part of the same loan agreement that included the purchase price for the Nissan Sentra. The seller assigned the loan to HSBC Auto Finance ("HSBC").  HSBC financed a total of $19,248.36.

On October 20, 2006, less than 910 days after purchasing the Nissan Sentra, Carpenter filed a petition under Chapter 13 of the Bankruptcy Code.  HSBC timely filed a proof of claim for $19,162.97.  Through her attorney, Carpenter filed a Chapter 13 plan proposing bifurcation of the claim held by HSBC into a secured portion equal to the value of the Nissan, $12,621, and an unsecured portion equal to the remaining outstanding balance of the debt.  HSBC filed an objection to the confirmation of Carpenter's plan because of the bifurcation of its debt into

secured and unsecured portions.  The parties do not dispute that the certificate of title for the

Nissan Sentra lists HSBC as the first lienholder.  Carpenter maintains that she is entitled to

bifurcate the secured claim because it includes not only the purchase price of the Nissan Sentra

but also the financing for the repayment of the negative equity from her trade-in.[3]

CONCLUSIONS OF LAW

The Court has jurisdiction over the parties and the subject matter of these proceedings

pursuant to 28 U.S.C. § 1334.  These are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(K)

and (L).  Resolution of this matter requires the Court to address the interaction between the

confirmation requirements of § 1325(a)(5) of the Bankruptcy Code,[4] and the infamous "hanging

paragraph" following § 1325(a).

Section 1325 of the Bankruptcy Code sets forth the requirements for confirmation of a

Chapter 13 plan.  Section 1325(a)(5) provides that if a Chapter 13 plan is to be confirmed, a

debtor must either (i) comply with subparagraph (A) by obtaining the acceptance of the plan

---

[3]  The LaVignes, the Hunts, Oliver, and Carpenter are hereinafter jointly referred to as the "Debtors".  GMAC, BB&T, Citifinancial, and HSBC are hereinafter jointly referred to as the "Creditors".

[4]  11 U.S.C. § 1325(a)(5)  prescribes the treatment for each "allowed secured claim provided for by the plan:"
  (a)  Except as provided in subsection (b), the court shall confirm a plan if -
   . . .
      (5) with respect to each allowed secured claim provided for by the plan –
        (A) the holder of such claim has accepted the plan;
        (B) (i) the plan provides that —
          (I) the holder of such claim retain the lien securing such claim until the earlier of –
            (aa) the payment of the underlying debt determined under nonbankruptcy law; or
            (bb) discharge under section 1328; and
          (II) if the case under this chapter is dismissed or converted without completion of the plan, such
            lien shall also be retained by such holder to the extent recognized by applicable
            nonbankruptcy law;
         (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on
          account of such claim is not less than the allowed amount of such claim; and
       (iii) if –
         (I) property to be distributed pursuant to this subsection is in the form of periodic payments,
          such payments shall be in equal monthly amounts; and
         (II) the holder of the claim is secured by personal property, the amount of such payments shall
          not be less than an amount sufficient to provide to the holder of such claim adequate
          protection during the period of the plan; or
      (C) the debtor surrenders the property securing such claim to such holder;
11 U.S.C. §1325(a)(5) (Supp. V 2005).

from each secured creditor, (ii) comply with subparagraph (C) by surrendering the secured creditor's collateral, or (iii) comply with the provisions of subparagraph (B), which comprise the bulk of § 1325(a)(5). In this case, the Debtors are proposing to pay the allowed amount of the Creditors' secured claims in accordance with subparagraph (B).

Prior to the enactment of BAPCPA, Debtors would have been required to determine the allowed amount of a creditor's secured claim by applying the provisions of § 506 of the Bankruptcy Code. Section 506 governs the extent to which an allowed claim is secured. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 238–39 (1989) (Section 506 "governs the definition and treatment of secured claims, *i.e.*, claims by creditors against the estate that are secured by a lien on property in which the estate has an interest."). Most relevant to the cases here, § 506 provides that an allowed claim "is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1) (Supp. V 2005). Thus, a debtor would be able to bifurcate a creditor's claim into secured and unsecured portions, the amount of the secured portion being set as the value of the collateral and the amount of the unsecured portion being set as the amount by which the claim exceeds the value of the collateral. The unsecured portion of the claim would be paid pro-rata with the other general nonpriority unsecured creditors. Payment of the secured portion would be governed by 11 U.S.C. § 1325(a)(5).

BAPCPA changed this practice with the addition of the section that has come to be known as the "hanging paragraph," so called because of its insertion into § 1325 of the Bankruptcy Code immediately following subparagraph (a), but bearing no numbering of any type. The hanging paragraph states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day[s] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 29) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a) (Supp. V 2005).  If a creditor has a purchase money security interest in a vehicle purchased for the personal use of the debtor in the 910 days before the debtor filed for bankruptcy, the hanging paragraph prohibits the court from confirming a Chapter 13 plan that makes a creditor unsecured to the extent the outstanding loan exceeds the value of the collateral.[5]

The Creditors in these actions argue that the hanging paragraph prevents the bifurcation of their claims because they have purchase money security interests protected by this new addition to the Bankruptcy Code.  The Debtors assert that the Creditors do not have purchase money security interests because the vehicles in each of these cases secure not only loans as to the purchase price but also as to the negative equity that remained in the Debtors' trade-in vehicles.  Thus, confirmation of the Debtors' plans in each of these four cases hinges upon whether the Creditors have purchase money security interests in the applicable vehicles.

In order to determine whether the Creditors have purchase money security interests, the Court must first derive the meaning of that term.  Although the Bankruptcy Code makes reference to the term "purchase money security interest" in at least two other instances, *see* 11 U.S.C. § 522(f) (Supp. V 2005), and 11 U.S.C. § 1110(d)(2) (Supp. V 2005), Congress has not

---

[5]  "While there is considerable debate among the courts as to the finer points of the hanging paragraph, there is wide agreement that claims governed by it cannot be 'crammed down' in a chapter 13 plan to the value of the collateral but must be treated as fully secured."  *In re Huddle,* No. 06-11074-SSM, 2007 WL 2332390, at *2 (Bankr. E.D. Va. Aug. 13, 2007) (citing *In re Johnson,* 337 B.R. 269, 273 (Bankr. M.D.N.C. 2006); *In re Trejos,* 352 B.R. 249, 266–67 (Bankr. D. Nev. 2006)).

defined the term in the Bankruptcy Code or elsewhere.[6]   Most courts that have interpreted the

term "purchase money security interest" in the context of § 522(f)[7] have looked to state law for

the definition.  *See*, *e.g.*, *Billings v. Avco Colo. Indus. Bank (In re Billings)*, 838 F2d 405, 406

(10th Cir. 1988) (explaining that for the definition of purchase money security interest under §

522(f)(2), "the courts have uniformly looked to the law of the state in which the security interest

is created"); *In re Leftwich*, 174 B.R. 54, 57–58 (Bankr. W.D. Va. 1994).   Because the hanging

paragraph was enacted after § 522(f), the Court infers that Congress was aware of the practice of

looking to state law in this context.  *Cf. Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) ("In

sum, it is not only appropriate but also realistic to presume that Congress was thoroughly

familiar with these unusually important precedents from this and other federal courts and that it

expected its enactment to be interpreted in conformity with them").   Thus, this Court will turn to

state law for guidance in deciphering the term "purchase money security interest."

    The Virginia Uniform Commercial Code defines purchase money security interest in

Virginia Code § 8.9A-103:  "A security interest in goods is a purchase-money security interest:

to the extent that the goods are purchase-money collateral with respect to that security interest."

Virginia Code § 8.9A-103(a)(1) defines purchase money collateral as "goods or software that

secures a purchase-money obligation incurred with respect to that collateral."   Virginia Code

---

[6]  The court in *In re Westfall*, 365 B.R. 755, 759 n.4 (Bankr. N.D. Ohio 2007) provides an excellent discussion of
why Congress should adopt a federal definition of the term "purchase money security interest."   Upon further
briefing on the issue of adoption of a federal definition of the term "purchase money security interest," the *Westfall*
court continued its support of a federal definition of the term.  *See In re* Westfall, No. 06-60297, 2007 WL 2777709,
at *9 (Bankr. N.D. Ohio Sept. 24, 2007) ("[T]he court finds that it can utilize a federal understanding of purchase
money security interest for purposes of applying the hanging paragraph.  Although a federal right is not at stake,
thereby discouraging use of a federal definition, the other two prongs fall in favor of a federal interpretation.  While
legislative intent is not clear, the intent of the Revised Uniform Commercial Code is clear and it supports a federal,
and specifically bankruptcy, definition of purchase money security interest for section 9-103.  Neither will a federal
definition engender upheaval of commercial transactions.").

[7]  11 U.S.C. § 522(f)(2) provides that a debtor may avoid a non-possesory, non-purchase money security interest in
exempt household goods, among other things.

§ 8.9A-103(a)(2) describes a purchase money obligation as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."[8]

Purchase money financing covers the acquisition cost of collateral.  A security interest qualifies as purchase money to the extent that it covers assets acquired by the debtor with the value provided by the creditor.  It is purchase money only to the extent of the credit price of the acquired assets.  Purchase money security interests are accorded special status under the Virginia Uniform Commercial Code.  First, consumer lenders enjoy automatic perfection under Virginia Code § 8.9A-309(a)(1).  In addition, purchase money security interests are entitled to priority under Virginia Code § 8.9A-317(e) and Virginia Code § 8.9A-324.

"A purchase money security interest may not cover a pre-existing claim or an antecedent debt." *Butterworth Furn. Co. v. Penny,* 15 B.R. 124, 127 (Bankr. E.D. Va. 1981).  Numerous courts have considered whether a security interest loses its purchase money status when a secured party refinances or consolidates the purchase money debt with non-purchase money debt.  *Leftwich,* 174 B.R. at 58; *see generally* White & Summers, Uniform Commercial Code, § 31-6 (5th ed. 2002).  When a lender refinances a purchase money obligation, the collateral loses its characterization as a purchase money security interest.  *Dominion Bank of the Cumberland v. Nuckolls (In re Nuckolls)*, 780 F.2d 408, 413 (4th Cir. 1985) (refinance of original loans used in part to purchase restaurant equipment extinguished the purchase money character of the debt); *see generally* R. Lloyd, 45 Cons. Fin. L.Q. Rep. 69, 72 (1991)

---

[8]  The Virginia General Assembly amended the Code of Virginia, effective as of July 1, 2001, to add new revised article 9 as part of Virginia's Uniform Commercial Code (hereinafter referred to as "Revised Article 9").  Other than the limitation to an interest in goods and to software acquired with goods, revised Virginia Code § 8.9A-103(a) and (b) retains the same basic elements for a purchase money security interest that were contained in old Virginia Code § 8.9-107.

("Unfortunately, purchase money status is a rather delicate creature.  It can easily be lost if the secured party consolidates or refinances debt.").

Negative equity is antecedent debt.  *See In re Pajot*, 371 B.R. 139, 154 (Bankr. E.D.Va. 2007).  If these Creditors had refinanced the Debtors' original car loans, there would be no question that the characterization of the security interest as purchase money would have been lost.  *Nuckolls*, 780 F.2d at 413.  It follows that refinancing negative equity by rolling it into a new purchase money loan does not thereby create a purchase money obligation at least to the extent of the antecedent debt that was refinanced.  *Pajot*, 371 at 139–65.

The Creditors have posited three reasons why this holding should not result.  First, the Creditors urge the Court to follow the reasoning of cases such as *Gen. Motors Acceptance Corp. v. Peaslee (In re Peaslee)*, 373 B.R. 252 (W.D.N.Y. 2007), in which the courts have read the relevant state's installment sales statute *in pari materia* with the Uniform Commercial Code and held that the term "price" as employed in the Uniform Commercial Code includes negative equity.  *Peaslee*, 373 B.R. at 260–62.  Alternatively, the Creditors propose the Court read the Uniform Commercial Code *in pari materia* with the Federal Truth in Lending Act, which requires sellers to disclose negative equity as part of the "total sales price." [9]

---

[9]   The Creditors' argument goes as follows.  First, The Virginia retail installment sales statute includes, in its definition of what is a single charge as opposed to an additional charge, the negative equity on a trade-in vehicle under Va. Code Ann. § 6.1-330.77.  According to the Creditors, although the Virginia retail installment sales statute makes no reference to the term "purchase money obligation," this treatment of negative equity as being included within the single charge for the cost of the vehicle and the fact that the Virginia retail installment sales statute only deals with purchase money security interests suggests that the legislature saw the purchase price and negative equity as one transaction.  Brief in Support of its Objection to the Debtor's Proposed Chapter 13 Plan at 21–22, *In re* LaVigne (No. 07-30192) (Bankr. E.D.Va. argued Aug. 15, 2007) [hereinafter GMAC Brief].  Furthermore, the Virginia General Assembly enacted the Virginia retail installment sales statute during the same legislative session as it enacted Revised Article 9 of the Uniform Commercial Code (which became effective on July 1, 2001).  In 1999, the Federal Reserve Board passed Regulation Z to implement the Federal Truth in Lending Act.  12 C.F.R. § 226 (1999).  Regulation Z mandated that dealers disclose negative equity as part of the "total sales price" of vehicles.  Section 8.9A-201(b) of the Virginia Uniform Commercial Code provides that a transaction governed by the UCC is subject to any applicable rule of law which establishes a different rule for consumers.

The Creditors conclude from the confluence of these otherwise unrelated statutes that the term "sales price" must include negative equity.  Even if the Court were to read these statutes *in pari materia,* this result does not

In essence, the Creditors' argument asserts that negative equity is part of the purchase price of the vehicle. There had been a developing trend under old Virginia Code § 8.9-107 that "price" was not limited to the list price at which the sale would occur in an all cash transaction. Rather, price was construed to include financing charges and other similar expenses because credit sales always involved such items. Price under old Virginia Code § 8.9-107 developed to mean credit price. Official Comment 3 to Revised Virginia Code § 8.9A-103 confirmed this practice. It provides that under the Revised Article 9 that "price" and "value given to enable" include:

> obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

Va. Code Ann. § 8.9A-103(a)(2) cmt. 3.

The Creditors now urge the Court to expand the definition of "price" to swallow the well-established rule that purchase money collateral cannot secure a non-purchase money obligation. They maintain that if the Court would only read the Virginia Uniform Commercial Code *in pari materia* with the Virginia retail installment sales statute and with the Federal Truth in Lending Act, the Court would find that the term "price" as used in the Virginia Uniform Commercial Code includes negative equity. GMAC Brief at 21–23.

---

necessarily follow. The Creditors ignore other statutes that are more closely related to the Uniform Commercial Code and that actually do deal with purchase money security interests. For example, the Credit Practices Rules promulgated by the Federal Trade Commission pursuant to 15 U.S.C. § 57(a)(1)(B) do not adopt a separate definition for a purchase money security interest but rather refer to the definition in old § 9-107 of the Uniform Commercial Code. The Creditors also ignore the fact that Revised Article 9 includes new § 9-103(f). That section clearly acknowledged the well-established rule that purchase money collateral cannot secure a non-purchase money obligation. It did so by preserving the status of the purchase money portion of the transaction for non-consumer goods transactions. In making this change from prior law, the statute admonished that: "The court may not infer [from this change] . . . the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches." Va. Code Ann. § 8.9A-103(h).

The Creditors' argument is strained.  In order for courts to read statutes *in pari materia* "they must 'relate to the same subject matter.'"  *Pajot,* 371 B.R. at 150 (quoting *Ipsen v. Moxley,* 49 Va. App. 555, 561, 642 S.E.2d 798, 801 (Va. Ct. App. 2007)).  The Federal Truth in Lending Act is a consumer disclosure statute.  It does not relate to the same subject matter as the Uniform Commercial Code, which deals with consensual security interests in personal property and fixtures.  Although the Federal Truth in Lending Act requires that the amount of negative equity be disclosed as a component of the purchase price, this disclosure obligation does not transform the pre-existing indebtedness into a component of the cost of the vehicle.  Similarly, the Virginia retail installment sales statute offers no guidance for the interpretation of the Uniform Commercial Code.  It makes no reference whatsoever to the terms "purchase money security interest," "purchase money collateral," or "purchase money obligation."  As such, "the statute's gloss on sales prices is not sufficiently related to the Uniform Commercial Code's definition of purchase-money obligations."  *Id.*  The Court will not read the statutes *in pari materia* and hold that the term "price" as employed in Virginia Code § 8.9A-103(a)(2) was intended to include negative equity.

Additionally, the Creditors argue that the definition of "value given to enable" necessarily includes negative equity.  The Creditors point to Official Comment 3 of Virginia Code § 8.9A-103, which provides that "value given to enable" includes "expenses incurred in connection with acquiring rights in the collateral."  The Creditors contend, and some other courts have held, that the use of this phraseology in Official Comment 3 is broad enough to include negative equity.  The court in *Peaslee* reached just this result.  *Peaslee,* 373 B.R. at 260–62.  The district court there was persuaded by the fact that no qualifying or limiting language, such as "including . . .," followed the phrase, "expenses incurred in connection with acquiring rights in

the collateral." *Id*. at 258.  Armed with this observation, the court found it immaterial that negative equity was not included in the subsequent list of expenses.  *Id*. at 258–59.  The *Peaslee* court was equally unimpressed that negative equity was unlike all of the other expenditures enumerated in the comment.  *Id*.  It refused to recognize the established jurisprudence that antecedent debt was anathema to new value; instead, the *Peaslee* court concluded that paying off antecedent debt on a trade-in vehicle was indeed an expense that enabled the purchase of the new vehicle.  *Id.*

This Court disagrees.  The liability for the negative equity was not incurred in connection with acquiring the vehicle.  That liability necessarily preceded the acquisition.  The pre-existing indebtedness was simply rolled into the new car loan.  As the court observed in *Pajot*, "the substance of the transaction, though instantaneous, is that the second creditor is paying off the debtor's unsecured deficiency debt on the first vehicle."  *Pajot*, 371 B.R. at 154 ("In essence, at the moment the first vehicle is 'bought' by the second creditor as a trade-in, the secured debt held by the first creditor is satisfied by the value paid for the car.  The deficiency – the amount the first creditor's debt exceeds collateral value as determined at the time of trade – is the negative equity.  This deficiency is unsecured just as it would be if the first creditor had foreclosed.").

Furthermore, the negative equity was not "value given to enable" because it is not an "expense" of sale.  An "expense" is a cost incident to the purchase.  The term "expense" may include the titling fees for a car because the buyer's purchase of a car would be meaningless without obtaining the title to it.[10]  The elimination of prior indebtedness, while it may be a

---

[10]  Other "expenses incurred in connection with acquiring rights in collateral" typical to a motor vehicle acquisition such as sales taxes, duties, finance charges, interest, freight charges, and administrative charges, are all insubstantial in comparison to the actual sales price.  Negative equity, on the other hand, is a large component of the new financing.  *Pajot*, 371 B.R. at 152–53.

condition for securing approval of needed financing, is simply not essential to the acquisition of

a new motor vehicle.   A buyer need not dispose of a previously purchased vehicle and refinance

whatever negative equity may be in it before purchasing a new one.   In fact, it is not unusual for

a debtor to owe money on more than one vehicle.   While it may be convenient to refinance

negative equity as part of a new vehicle loan, purchasers have no obligation to do so.   To the

extent purchasers desire to relieve themselves of such an antecedent obligation, other alternatives

are available to alleviate the debt.

While an expense is not limited to a cost required by law, it must be of such a nature that

it was incurred in connection with the purchase of the vehicle.   Negative equity is not a cost

incurred in connection with the new acquisition, but rather it is an obligation that pre-existed the

transaction.   Negative equity in a trade-in vehicle is simply not an "expense" incurred as part of

the acquisition, as the term expense is used in Official Comment 3 to Virginia Code § 8.9A-103.

The new financing merely facilitates the ability to extend the repayment of previously incurred

indebtedness.[11]

Finally, the Creditors suggest that this Court should determine that the terms "price" and

"value given to enable" include the concept of negative equity because the Virginia Uniform

Commercial Code directs courts to interpret the statute in ways that further commercial practices.

GMAC Brief at 11–12.   The Virginia Uniform Commercial Code instructs courts to interpret its

statutory provisions in a way that "permit[s] the continued expansion of commercial practices

---

[11]   This Court is not alone in finding that negative equity is not "value given to enable."   Other courts reaching this
result have focused their analysis on the close nexus requirement set forth in Official Comment 3 to Va. Code Ann.
§ 8.9A-103.   In *Pajot*, the court noted that "the only possible nexus is that the purpose of the first debt was to
acquire a vehicle, and the second debt is also to acquire a vehicle." *Pajot*, 371 B.R. at 154.   If the second creditor
did not agree to pay off the negative equity, the debtor still would have had options, including continuing to make
payments to the first creditor.   In that instance, however, the debt would have become unsecured. *Id.*   The court in
*Pajot* concluded that because the debtor had these other options, there was no close nexus between the creditor's
paying off of the negative equity and the purchase of the collateral. *Id.*

through custom, usage, and agreement of the parties."  Va. Code Ann. § 8.1A-103(a)(2).  The

practice of financing negative equity in vehicles has been on the rise in recent years and is now

considered a standard practice throughout the industry.   GMAC Brief at 14.   Consistent

therewith, J. D. Power and Associates now estimates that approximately 38% of all new car

buyers have negative equity at the time of trade-in. *See* FDIC, *The Changing Landscape of*

*Indirect Automobile Lending,* Supervisory Insights, Summer 2005, at 29, *available at*

http://www.fdic.gov/regulations/examinations/supervisory/insights/sisum05/si_summer05.pdf.

For debtors on the brink of bankruptcy, encouraging the purchase of a new car with

negative equity remaining in an older functioning car is not a sound financial practice.  This is

not a policy that the Bankruptcy Code seeks to promote.  The *Pajot* court emphasized this point:

> While an increase in capital availability could arguably be even
> better for debtors, this court is hesitant to make such a
> proclamation because many individuals facing a negative equity
> "deal" to buy a new car are not facing a critical capital crisis with
> respect to transportation.  This is not to say that their outlook is
> positive, but these debtors *have a functioning car* worthy of a
> trade-in.

*Pajot*, 371 B.R. at 164. The Bankruptcy Code, by simply adopting a concept from the Uniform

Commercial Code, cannot be said to embrace the expansion of a commercial practice that would

be damaging to the financial well being of debtors.  The court in *Pajot* noted that all of the

debtors in those cases before the court had traded in cars that were less than four years old.  *Id.* at

164–65.  The facts in the cases at bar are entirely consistent with the findings made in the *Pajot*

case.   Three of the four Debtors traded in vehicles that were less than three years old.   The

acquisition of a new car does not appear to have been an effort to avoid bankruptcy in these

cases.  The expansion of a commercial practice that would have a detrimental effect upon debtors

should not have a positive bearing upon this Court's interpretation of a statute.

The difficult question in this case is not whether negative equity is antecedent debt as opposed to an acquisition expense. Rather, the question is what consequence should result from a loan that combines purchase money debt with non-purchase money debt. The United States Circuit Courts of Appeal are divided on this issue. Some circuits hold that the combination transforms the creditor's entire security interest into a non-purchase money security interest (the "transformation rule"). *Matthews v. Transamerica Fin. Servs. (In re Matthews)*, 724 F.2d 798, 800-01 (9th Cir. 1984); *see also Rosen v. Assoc. Fin. Servs. (In re Rosen)*, 17 B.R. 436 (D.S.C. 1982); *In re Ward*, 14 B.R. 549 (S.D. Ga. 1981); *In re Ellegood*, 362 B.R. 696, 698 (Bankr. E.D. Va. 2007); *In re Hobdy*, 18 B.R. 70 (Bankr. W.D. Ky. 1982); *In re Kelley*, 17 B.R. 770 (Bankr. E.D. Tenn. 1982); *In re Jones*, 5 B.R. 655 (Bankr. M.D.N.C. 1980). The transformation rule is a *per se* rule that holds that whenever purchase money debt is combined with non-purchase money debt, the purchase money debt is transformed into non-purchase money debt. The transformation rule comes into play regardless of the circumstances under which the debts are combined and regardless of the intent of the parties. R. Lloyd, 45 Cons. Fin. L.Q. Rep. 69, 72 (1991).

Other circuits hold that the lender may retain a purchase money security interest on the purchase money portion of the loan (the "dual status rule"). *Billings v. AVCO Colo. Indus. Bank (In re Billings)*, 838 F.2d 405 (10th Cir. 1988); *see also Geist v. Converse County Bank (In re Geist)*, 79 B.R. 939 (D. Wyo. 1987); *Davis v. Empris Bank (In re Jackson)*, 358 B.R. 412 (Bankr.D.Kan. 2007); *In re Express Air, Inc.*, 136 B.R. 328 (Bankr.D.Mass. 1992); *In re Pan Am Corp.*, 124 B.R. 960, 971 (Bankr. S.D.N.Y. 1991). The dual status rule holds that a single security interest may be comprised of both a purchase money component and a non-purchase money component. *See* Va. Code Ann. § 8.9A-103 cmt. 7.

The United States Court of Appeals for the Fourth Circuit applied the transformation rule in *Nuckolls*. 780 F.2d at 413. The bankruptcy court in *Huddle* followed this precedent and applied the transformation rule: "[T]he Fourth Circuit decision in *Nuckolls* remains good law in the consumer-goods context and compels a determination that the purchase-money character of [the lender's] security interest was lost when the original loan was refinanced . . . ." *In re Huddle*, No. 06-11074-SSM, 2007 WL 2332390 (Bankr. E.D. Va. Aug. 13, 2007). The bankruptcy court in *Leftwich,* on the other hand, applied the dual status rule after finding that the facts in that case were distinguishable from those in *Nuckolls*. *Leftwich*, 174 B.R. at 59–60. In adopting the dual status rule, the *Pajot* court found that the *Nuckolls* rule was not dispositive given the significant revisions that had been made to Article 9 after *Nuckolls* was decided. *Pajot*, 371 B.R. at 157 n.20. The holdings in *Leftwich* and *Pajot* are consistent with the modern trend. R. Lloyd, 45 Cons. Fin. L.Q. Rep. 69, 72 (1991).

For the reasons set forth below, this Court adopts the dual status rule and holds that the non-purchase money status of the negative equity does not destroy the creditor's purchase money security interest in the purchase price of the motor vehicle.

Virginia Code § 8.9A-103(f) adopts the dual status rule for non-consumer goods transactions. Virginia Code § 8.9A-103(h) allows courts to determine whether to apply the transformation or dual status rule in consumer goods transactions. That section emphasizes that the Uniform Commercial Code's adoption of the dual status rule for non-consumer goods transactions does not imply that it is the better rule in consumer goods transactions.

Section 8.9A-204.1 is unique to the Virginia version of the Uniform Commercial Code.[12] This section allows a secured creditor in a consumer transaction to maintain a security interest in

---

[12]  That section states:

collateral to the extent of the purchase price of the collateral even if that debt is consolidated with other consumer debt.  While not entirely on point, the court in *Leftwich* read Virginia Code § 8.9-204.1[13] to favor application of the dual status rule for consumer goods transactions that adhere to the provisions of that statute.  *Leftwich*, 174 B.R. at 58.  There the court stated:

> Section 8.9-204.1 does not expressly provide that the interest which is protected by compliance with its provisions is necessarily a purchase money security interest as defined in Va.Code § 8.9-107(a).  However, nothing in § 8.9-204.1 indicates that refinancing a consumer purchase precludes retaining a purchase money security interest and the fact that Virginia enacted the provision as part of Article 9 of the U.C.C. supports a finding that a refinancing or consolidation does not automatically destroy an existing purchase money security interest.

*Id*.  Section 8.9A-204.1 by its terms is inapplicable to the sale of motor vehicles.  It does suggest, however, that the Virginia General Assembly may be leaning away from the harsh consequences that flow from the transformation rule where the secured lender can properly account for the secured portion of the debt and the proper application of payments it has received on that debt.  The factual differences under which Virginia Code § 8.9A-204.1 would apply, as when the debtor refinances a loan but keeps the collateral, and the present cases are not materially significant.  This Court thus follows the reasoning in *Leftwich* and concludes that under such

---

[A] seller may take a security interest only in the goods sold; provided, however, this section shall apply only to the sale of consumer goods as defined in § 8.9A-102(23).  Where the unpaid debts from two or more sales of consumer goods are consolidated into one debt payable on a single schedule of payments, and the consolidated debt is secured by security interests in the consumer goods sold, the payments made by the debtor under the consolidated schedule may be applied to the payment of the debts arising from the sales either (1) in the order in which the sales were made, starting with the first sale, or (2) in the same proportion as the original debts arising from the various sales bear to one another.  To the extent debts are paid according to this section, security interests in the consumer goods sold will terminate as the debt originally incurred with respect to each item is paid.

[13]  After Revised Article 9 was passed, the text of this section remained the same; only its citation changed to 8.9A-204.1 and its references to other sections within Article 9.

circumstances the Creditors should retain a purchase money security interest for the amount of the purchase price of the vehicle that they financed.

Application of the dual status rule also serves to advance the intent of Congress in amending 11 U.S.C. § 1325(a) to include the hanging paragraph.  The hanging paragraph was adopted to prevent perceived abuse by debtors.  *Pajot,* 371 B.R. at 159–60.  When a debtor purchases a car, its value decreases substantially from the moment that the car leaves the dealership.  Congress intended to stop the practice by which debtors could cram down a creditor's secured claim on a motor vehicle purchased within the 910-day period preceding bankruptcy by bifurcating a secured creditor's claim into secured and unsecured portions based upon the value of the collateral.  *Id.* at 159–60 n.26.  If this Court were to adopt the transformation rule, then debtors would be able to decrease the amount of the secured claims to the value of their motor vehicles simply because the creditors also paid for the debtors' negative equity in their trade-in vehicles.  It is not likely that Congress intended such a result.

Finally, the Court finds support for adoption of the dual status rule in the language of the Virginia Uniform Commercial Code itself.  Virginia Code § 8.9A-103 provides that a security interest is a purchase money security interest "*to the extent* that the goods are purchase money collateral."  Although the Virginia General Assembly stated in Virginia Code § 8.9A-103(h) that it "intended to leave to the court the determination of the proper rules [dual status or transformation] in consumer goods transactions," the language "to the extent" suggests that the collateral can secure more than its purchase price while retaining its purchase money character as to the amount of the purchase price.

Courts that have applied the transformation rule have done so because they have found the transformation rule easier to administer.  *In re Price,* 363 B.R. 734, 745–46 (E.D.N.C. 2007).

20

The concern is that the "actual purchase price" of a vehicle may be subject to manipulation. Car dealerships may be able to shroud the purchase price in mystery by changing the price of the car depending upon the amount given to the buyer for the trade-in. *Id*. Creditors may be able to manipulate the value of their secured claim by increasing the price of the vehicle and lowering the price of non-purchase money items. *See id*. Such concerns are not insurmountable. In most cases, the actual price of a vehicle may be gleaned from a dealer's Federal Truth in Lending Act statements. *Pajot,* 371 B.R. at 163. Under the dual status rule, a lender may lose its purchase money status if it is unable to prove how much of the consolidated debt is purchase money and how much is non-purchase money.[14] As the court stated in *Pajot*:

> [B]ecause the choice between dual status and transformation rules is left to the court's discretion by Virginia Code § 8.9A-103(h), the court may determine on a case by case basis that certain transaction details are not clearly articulated enough to apply the dual status rule. Therefore, if a negative equity transaction is structured such as to obfuscate transaction details or otherwise abuse the dual status rule, this court will not hesitate to discretionarily apply the more stringent transformation rule.

*Pajot*, 371 B.R. at 164. The Court is satisfied that it can overcome potential problems with administration of the dual status rule and potential manipulation of the terms of the transaction by placing the burden on the lender to properly account for the purchase money portion of the debt.

Having adopted the dual status rule, the Court finally must decide how to allocate the payments these Debtors have made on their vehicles prior to filing for bankruptcy. For the sake of consistency, the Court chooses to adopt the approach used in the *Pajot* case, applying the payments pro rata between the negative equity and the purchase price. *See id*. at 162. While this Court recognizes the difficulty in determining the number and amount of payments received

---

[14]   In a non-consumer goods transaction, the secured party "has the burden of establishing the extent to which the security interest is a purchase-money security interest." Va. Code Ann. § 8.9A-103(g).

because of interest and penalties accruing over time, it once again will adopt the *Pajot* approach of assuming that the interest and penalties also accumulate proportionately. *Id*. at 161–62.

The Debtors have also asked the Court to consider whether extended service contracts destroy the purchase money status of the Creditors' claims. Parties cannot maintain a purchase money security interest in these contracts because they are not purchase money collateral. Va. Code Ann. § 8.9A-103(a)(1) (limiting purchase money collateral to goods and software). The contracts involve a commitment to render future services. Extended service contracts are executory in nature and the Creditors do not have a purchase money security interest in them.

Finally, Debtors assert that the disability, single interest, and gap insurance policies accompanying the purchase of some of these Debtors' vehicles destroy the purchase money status of the Creditors' claims. As with extended service contracts, the Creditors cannot have purchase money security interests in debtors' insurance policies because they are not purchase money collateral. *Id.* "[Gap insurance] is neither mandatory, a component of the loan agreement, nor a value-enhancing add-on, and thus is dissimilar to the examples listed in the Official Comment [to the Uniform Commercial Code] statute defining a purchase money security interest." *Price*, 363 B.R. at 741. This holding is consistent with that of other courts. *In re Honcoop*, No. 07-1358, 2007 WL 3133936 at *3 (Bankr. M.D. Fla. Sept. 19, 2007) ("The Court finds that it is only proper to include those nonessential items that enhance or improve the value of the vehicle, such as window tinting or undercoating, in the purchase price. Clearly GAP insurance does not fit into this category, as the sole purpose of GAP insurance is to protect the owner of the vehicle in instances in which the portion of damage done to the vehicle is greater than its value. As the very nature of GAP insurance does not involve the overall enhancement of the vehicle, it cannot be properly construed as part of the purchase price nor does the Court find

the requisite close nexus between the inclusion of GAP insurance and the acquisition of the vehicle."); *Pajot*, 371 B.R. at 155; *Price*, 363 B.R. at 734; *In re White*, 352 B.R. 633, 638–39 (Bankr. E.D. La. 2006).

Because this Court has adopted the dual status rule, the fact that the Creditors do not have purchase money security interests in these insurance policies and the extended service contracts does not destroy their purchase money security interests in the price of the vehicles.

<u>CONCLUSION</u>

The Creditors do not have a purchase money security interest in connection with the financing they provided to pay off the negative equity in the Debtors' vehicles or to fund the Debtors' acquisition of insurance policies or extended warranty contracts.  Applying the dual status rule, the financing provided by the creditors for the purchase price does not lose its purchase money character because it was combined with this non-purchase money debt.  The portion of the Creditors' claim that secures the purchase price of the vehicle is governed by the hanging paragraph added by BAPCPA and must be treated as fully secured.  The balance of the Creditors' secured claim is governed by § 506 of the Bankruptcy Code and may be bifurcated.  As the Debtors' plans in these cases seek to bifurcate the entire secured claim of the Creditors and not just the non-purchase money portion of their claim, the Court will sustain the objections of the Creditors to the Debtors' plans.  A separate order shall issue in each case.

ENTERED:  _____


_____/s/ Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE

Copies to:

Aaron Kyle LaVigne
Amanda Marie LaVigne
1618 Westbury Ridge Drive
Midlothian, VA  23114

Mark C. Leffler
Boleman Law Firm, P.C.
P.O. Box 11588
Richmond, VA  23230-1588

Carl A. Eason
Steven L. Brown
Wolcott Rivers Gates
One Columbus Center, Suite 1100
Virginia Beach, Va.  23462-1100

Barkley Clark
Katherine M. Sutcliffe Becker
Stinson Morrison Hecker LLP
1150 18th Street, NW
Suite 800
Washington, D.C.  20036

Romel Leon Hunt
Kimberly Antoinette Hunt
13613 Duxton Drive
Chester, VA  23831

Julia Bonham Adair
Boleman Law Firm, P.C.
P.O. Box 11588
Richmond, VA  23230-1588

Barry W. Spear
BARRY W. SPEAR, P.C.
729 Thimble Shoals Boulevard, Suite 3-C
Newport News, VA  23606

Kenneth Leon Oliver
513 Greenbrier Ave.
Richmond, VA  23222

Deanna H. Hathaway
Boleman Law Firm, P.C.
P.O. Box 11588
Richmond, VA  23230-1588

Sara A. John
M. Richard Epps, P.C.
605 Lynnhaven Parkway
Virginia Beach, VA  23452

Andrea Lynn Carpenter
1316 Westridge Road
Richmond, VA  23229

James M. Flaherty
Boleman Law Firm
P.O. Box 11588
Richmond, VA  23230-1588

Carl M. Bates
P. O. Box 1819
Richmond, VA  23218

Robert E. Hyman
P.O. Box 1780
Richmond, VA  23218-1780

Robert B. Van Arsdale
Assistant U. S. Trustee
600 East Main Street, Suite 301
Richmond, VA  23219